IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM M. SMITH,

        Plaintiff,

                      3:12-CV-122-PK

v.                            FINDINGS AND
                            RECOMMENDATION

DEPUTY MARSHALL, SERGEANT JANE
DOE, LIEUTENANT SHIPLEY, and BOB
WOLFE,

        Defendants.

PAPAK, Magistrate Judge:

        Plaintiff William M. Smith, an incarcerated prisoner proceeding *pro se*, filed this action *in forma pauperis* against defendants identified as Deputy Marshall, Sergeant Jane Doe, Lieutenant Shipley, and Bob Wolfe, each in both his or her individual and official capacities, on January 23, 2012. Smith alleges Marshall's liability under the Civil Rights Act, 42 U.S.C. § 1983, for the violation of his rights under the Fourteenth and Eighth Amendments to the United States Constitution, alleges Shipley's and Doe's liability under Section 1983 for the violation of his rights under the Fourteenth and First Amendments and under Oregon common law for intentional infliction of emotional distress, and alleges Wolfe's liability under Section 1983 for

Page 1 - FINDINGS AND RECOMMENDATION

the violation of his rights under the Fourteenth Amendment. Smith seeks money damages on his claims, and does not seek any prospective injunctive relief.

Defendants Marshall, Shipley, and Wolfe (collectively, the "identified defendants") moved for summary judgment of Smith's claims on July 3, 2012. Subsequently, on July 13, 2012, Smith moved for voluntary dismissal of all of his claims without prejudice. On July 31, 2012, I denied Smith's motion, simultaneously reaffirming my previously issued order directing Smith to file his response to the identified defendants' dispositive motion by not later than August 19, 2012. Smith did not timely file any opposition to the identified defendants' dispositive motion, has not since attempted to file a response, and has not requested additional time within which to file a response.

Now before the court is the identified defendants' motion (#38) for summary judgment. I have considered the motion and all of the papers and pleadings on file. For the reasons set forth below, Smith's Section 1983 claims alleged against defendant Doe in her individual capacity and his state-law claims alleged against defendant Doe in any capacity should be dismissed without prejudice, and the identified defendants' motion for summary judgment should be granted in part and otherwise denied as moot, as set forth below.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## MATERIAL FACTUAL BACKGROUND[1]

At all material times, Smith was an inmate at Polk County Jail. Deputy Marshall was at all material times a deputy at the Polk County Jail charged with the direct supervision of jail inmates, including so-called "protective custody" inmates. Fictitiously named Sergeant Jane Doe was at all material times employed at the Polk County Jail to supervise inmates and respond to inmate complaints. Lieutenant Shipley was at all material times the facility commander at Polk County Jail, and was charged with supervision of jail employees, development and implementation of operational procedures at the jail, and final review of inmate grievances. Wolfe was at all material times the Sheriff of Polk County.

Smith was held at the Polk County Jail as a pretrial detainee from September 28, 2008, through July 21, 2010, and thereafter as a convicted prisoner awaiting sentencing until June 7, 2011. In accordance with operational protocol at Polk County Jail, Smith was initially assigned to housing in a unit referred to as "B-Block," which is where all inmates admitted to the jail are initially placed. Prisoners held in B-Block do not generally enjoy privileges granted to prisoners

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

Page 3 - FINDINGS AND RECOMMENDATION

held in different units. After an initial observation period, during which jail staff assess and evaluate inmates, a determination is made as to where newly admitted inmates should most appropriately be housed. Following a 72-hour observation period, Smith was assigned to a unit referred to as "D-Block."

Beginning February 19, 2009, Smith was placed on a "protective custody" status at his own request, apparently due to the fear that he would be assaulted by other inmates because of his status as a sex offender. Operational protocol at Polk County Jail requires that protective custody inmates be kept physically separate from other inmates, except when in the presence of a correctional officer.

Smith alleges that, apparently over the course of the year between February 2009 and February 2010, he filed at least four formal grievances regarding the conditions of his confinement. In February 2010, Smith was transferred back to B-Block, where he was housed until approximately April 2010. Smith alleges that the decision to transfer him back to B-Block was made by Shipley for the purpose of retaliating against him for filing grievances.

During the approximately two months that Smith spent in B-Block in 2010, he made repeated requests for transfer to a less restrictive unit. Smith alleges that these requests were made directly to defendants Shipley and Doe, and that the requests were routinely denied. While housed in B-Block, Smith was denied the television-watching, dayroom-access, or outdoor-exercise privileges that he had enjoyed while housed in D-Block.

On or around March 21, 2010, while Smith was housed at B-Block, Deputy Marshall delivered a hot dog Smith had ordered from the commissary. Marshall directed Smith to exit his cell and to receive the hot dog from her. Marshall watched Smith begin to return to his cell, but

Page 4 - FINDINGS AND RECOMMENDATION

left the B-Block dayroom, closing the door behind her, before he reached his cell. Because B-Block is a restricted unit, activity in the dayroom is videorecorded and monitored at all times; the videorecording shows that Smith did not return directly to his cell, but rather approached the dayroom door then spoke briefly to another inmate while walking backwards toward a location under a set of stairs where he was not visible to the security camera. The other inmate joined Smith under the stairs, following which Smith and the second inmate emerged from under the stairs engaged in a fight. Marshall was advised by the employee monitoring the security camera that a fight was in progress in B-Block, and returned to break the fight up. According to the security footage, Marshall returned to the scene fewer than 20 seconds after Smith first disappeared from camera view under the stairs.[2] Smith suffered minor scrapes and an injury to his throat during the fight. In addition, Smith alleges that he suffered sciatic nerve damage as a result of the fight.

Apparently following the incident of March 21, 2010, Smith was moved to a medical security cell in B-Block. While housed in the medical security cell, Smith was subject to constant observation via an in-cell video camera. Smith remained in the medical security cell for approximately one month, until he was transferred back to D-Block in approximately April 2010.

## ANALYSIS

Smith alleges Marshall's liability under Section 1983 for the violation of his rights under the Fourteenth and Eighth Amendments in connection with the incident of March 21, 2010,

---

[2] Although Smith alleges that he was "accosted by several inmates," the video footage indicates that Smith walked under the stairs of his own accord, and that only one other inmate was involved in the fight.. The security video clearly indicates that as soon as the altercation began, all other inmates who were present distanced themselves from the fight and sat down, presumably to advertise the fact of their non-involvement.

Page 5 - FINDINGS AND RECOMMENDATION

alleges Shipley's liability and Doe's liability under Section 1983 for the violation of his rights under the First Amendment in connection with his February 2010 transfer to B-Block and for the violation of his rights under the Fourteenth Amendment in connection with the deprivation of television-watching privileges that Smith suffered while housed in B-Block from February through April 2010, in connection with the deprivation of outdoor-exercise privileges that Smith suffered while housed in B-Block from February through April 2010, and in connection with being placed for one month in a medical security cell, and under Oregon common law for intentional infliction of emotional distress in connection with his February 2010 transfer to B-Block, and alleges Wolfe's liability under Section 1983 for the violation of his rights under the Fourteenth Amendment in connection with his failure to prevent Shipley's and Doe's alleged deprivations of his Fourteenth Amendment rights. As noted above, Smith seeks money damages on his claims, and does not seek prospective injunctive relief. Smith does not allege the liability of the State of Oregon, of Polk County, or of any other municipality or arm of the state. The three identified defendants move for summary judgment as to each of Smith's claims against them.[3]

I.  **Smith's Section 1983 Claims Alleged Against All Defendants in their Official Capacities**

Smith brings his claims against each of the four defendants in both his or her individual and official capacity. However, it is well settled law that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), *citing Brandon v. Holt*, 469

---

[3] The fourth defendant, fictitiously named Sergeant Jane Doe, has not appeared in this action and does not join in the identified defendants' motion.

Page 6 - FINDINGS AND RECOMMENDATION

U.S. 464, 471 (1985). "As such, [an official-capacity suit against an employee of the state] is no different from a suit against the State itself." *Id.*, citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985). Moreover, it is equally well established that the states are not suable persons for purposes of actions brought under Section 1983. *See id.* at 63-70. In consequence, Smith cannot establish the liability of any of the defendants under Section 1983 in their official capacities, and final judgment should be entered in favor of the defense as to each of Smith's Section 1983 claims to the extent alleged against any defendant in that defendant's official capacity.[4]

## II.  Smith's Section 1983 Claims Alleged Against Sergeant Jane Doe in her Individual Capacity; Smith's State-Law Claim Alleged Against Sergeant Jane Doe in Both her Individual Capacity and her Official Capacity

Smith named Doe as a defendant in this action, fictitiously, on January 23, 2012. On February 28, 2012, defendants filed a "Waiver of Service Form" signed by counsel for the identified defendants, by and through which counsel waived service of Smith's summons and complaint on Marshall, Shipley, and Wolfe, and expressly declined to waive service on behalf of Doe. Smith has not subsequently identified Doe or attempted to serve her with process in this action.

Federal Civil Procedure Rule 4(m) provides that, on a defense motion or on its own initiative, the court "shall" dismiss with prejudice a plaintiff's action against any defendant if service of the summons and complaint is not made on that defendant within 120 days after the complaint is filed, absent a showing of good cause for the delay. Fed. R. Civ. P. 4(m). Here,

---

[4] Smith neither alleges nor offers evidence that any of the alleged constitutional violations occurred pursuant to any custom or policy of any governmental body. In consequence, it would be inappropriate to treat his claims against the defendants in their official capacities as claims for municipal liability. *See, e.g., Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1186 (9th Cir. 2002).

Page 7 - FINDINGS AND RECOMMENDATION

Smith has neither served Doe nor responded to the identified defendants' motion for summary judgment (which fairly raises the issue) with any showing of good cause for the delay in serving Doe. In consequence, I recommend that Smith's Section 1983 claims be dismissed without prejudice to the extent alleged against Doe in her individual capacity, and that Smith's intentional infliction of emotional distress claim be dismissed without prejudice to the extent alleged against Doe in both her individual and her official capacities. *See id.*; *see also, e.g., Hason v. Medical Bd. of Cal.*, 279 F.3d 1167, 1174 (9th Cir. 2002); *Wilson v. Sullivan*, 168 Fed. Appx. 247 (9th Cir. 2006) (unpublished disposition).

### III.    Smith's Claims Alleged Against Deputy Marshall in her Individual Capacity

As noted above, Smith alleges Marshall's liability under Section 1983 for the violation of his rights under both the Fourteenth and Eighth Amendments to the United States Constitution, in connection with the fight in the B-Block dayroom on March 21, 2010. According to the evidentiary record, however, Smith was not a convicted prisoner but rather a pretrial detainee in March 2010, with the consequence that his claim based on Marshall's purported failure to prevent him from suffering harm at the hands of another inmate must be analyzed under the Fourteenth Amendment, and will not lie under the Eighth Amendment. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241-1243 (9th Cir. 2010); *Bell v. Wolfish*, 441 U.S. 520, 536-537, 536 n. 16 (1979). For this reason, the identified defendants' motion for summary judgment should be granted as to Smith's Section 1983 claim against Marshall in her individual capacity premised on her alleged violation of Smith's Eighth Amendment rights.

The courts of the Ninth Circuit consider claims premised on the failure to prevent harm to a pretrial detainee in violation of a detainee's Fourteenth Amendment rights under the same

Page 8 - FINDINGS AND RECOMMENDATION

standard applicable to Eighth Amendment claims premised on the failure to prevent harm to a prisoner. *See Clouthier*, 591 F.3d at 1242-1243; *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). Under that standard, a prisoner or detainee is required to establish both (i) that he or she was "incarcerated under conditions posing a substantial risk of serious harm," and (ii) that the detention official responsible for those conditions of confinement was deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). The second enumerated requirement, that the responsible official's state of mind be one of deliberate indifference to the inmate's health or safety, "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Id.*, quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). An official's state of mind is one of deliberate indifference to an inmate's safety if the official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and also actually "draw[s] the inference" that such risk exists, without taking reasonable action to prevent the harm from occurring. *Clouthier*, 591 F.3d at 1242. That is, actual awareness of the risk to inmate safety is required: where the official should have been aware of the risk but was not, there is no constitutional violation. *See id.*; *see also Jeffers v. Gomez*, 267 F.3d 895, 914 (9th Cir. 2001).

Here, defendant Marshall offers her sworn declaration that she waited until she saw that Smith was walking toward his cell before she turned to leave the B-Block dayroom, that the assault would not have occurred had Smith continued walking to his cell rather than making contact with the inmate who assaulted him, that she knew the dayroom was being monitored even in her own absence, and that she did not intend to "place [Smith] at any potential risk for harm" when she left him in the dayroom without an escort. Marshall further declares that she

Page 9 - FINDINGS AND RECOMMENDATION

promptly broke up the fight within seconds after it started, a fact which is confirmed by the videorecording of the incident.

In addition to Marshall's declaration, the evidentiary record contains the B-Block dayroom security camera's videorecord of the incident. The videorecording establishes, first, that Marshall acted with alacrity to put an end to the assault once she was aware that it was taking place, strongly implying that she was not indifferent to the risk Smith might suffer an injury once she became aware of that risk. In addition, the videorecording establishes that Smith largely created the risk that an assault might take place through his own voluntary conduct when, instead of returning to his cell as Marshall reasonably anticipated, he initiated contact with another inmate and went with him to a location outside the view of the dayroom security camera.

In the absence of any countervailing evidentiary proffer by Smith, Marshall's declaration considered together with the videorecording of the incident is sufficient to establish that she lacked the deliberate indifference necessary to establish her liability for the violation of Smith's Fourteenth Amendment rights in connection with the March 2010 fight in the B-Block dayroom. In consequence, the court need not consider whether Smith's injuries resulting from the incident were sufficiently serious to support his constitutional claim. The identified defendants' motion for summary judgment should be granted as to Smith's Section 1983 claim against Marshall in her individual capacity premised on her alleged violation of Smith's Fourteenth Amendment rights.

## IV.  Smith's Claims Alleged Against Shipley in her Individual Capacity

### A.  Smith's Fourteenth Amendment Claims Alleged Against Shipley in her Individual Capacity

As noted above, Smith alleges Shipley's liability under Section 1983 for the violation of his Fourteenth Amendment rights in connection with three separate alleged deprivations, each of which occurred while Smith was a pretrial detainee: the deprivation of his outdoor-exercise privileges that occurred while Smith was housed in B-Block between February and April 2010, the deprivation of his television-watching privileges that occurred while he was housed in B-Block between February and April 2010, and his placement in a medical cell in March and April 2010 following the B-Block dayroom fight of March 21, 2010. The Supreme Court has discussed the framework within which a pretrial detainee's unconstitutional conditions of confinement claim should be considered, as follows:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause [of the Fourteenth Amendment], a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. *See Ingraham v. Wright*, 430 U.S. 651, 671-672 n. 40, 674 (1977); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165-167, 186 (1963); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896). A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Gerstein v. Pugh*, [420 U.S. 103,] 114 [(1975)]; *see Virginia v. Paul*, 148 U.S. 107, 119 (1893). And, if he is detained for a suspected violation of a federal law, he also has had a bail hearing. *See* 18 U. S. C. §§ 3146, 3148. Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution.
>
> Not every disability imposed during pretrial detention amounts to "punishment" in

Page 11 - FINDINGS AND RECOMMENDATION

the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

\* \* \*

. . . A court must decide whether [a restriction impacting a pretrial detainee] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *See Flemming v. Nestor*, [363 U.S. 603,] 613-617 [(1960)]. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Kennedy v. Mendoza-Martinez, supra*, at 168-169; *see Flemming v. Nestor, supra*, at 617. **Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.** *See ibid.* Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. *Cf. United States v. Lovasco*, 431 U.S. 783, 790 (1977); *United States v. Russell*, 411 U.S. 423, 435 (1973).

*Bell*, 441 U.S. at 535-539 (emphasis supplied; footnotes omitted).

> 1. **Smith's Fourteenth Amendment Claim Premised on Denial of Outdoor-Exercise Privileges Alleged Against Shipley in her Individual Capacity**

Smith's first Fourteenth Amendment claim against Shipley arises in connection with her

alleged conduct depriving Smith of opportunities for outdoor exercise. It is clear that the deprivation of opportunities for outdoor exercise may provide the basis for a cognizable due process claim. *See, e.g., Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010); *LeMaire v. Maass*, 12 F.3d 1444, 1457-58 (9th Cir. 1993); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). Although there is no bright-line rule regarding the number of hours of outdoor exercise to which a pretrial detainee may be entitled over a given period of time, it is well settled that the temporary denial of outdoor exercise, without resultant medical effects, is not a substantial deprivation amounting to a constitutional violation, *see May v. Baldwin*, 109 F.3d 557, 565 (9th Cir.1997), while the deprivation of regular outdoor exercise for a prolonged period may constitute such a violation, *see Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (denial of all outdoor exercise for six weeks may be an unconstitutional deprivation); *Allen v. Sakai*, 48 F.3d 1082, 1086-1088 (9th Cir. 1995) (restriction to forty-five minutes of outdoor exercise per week for six weeks may be an unconstitutional deprivation).

Here, Shipley offers into evidence an "Inmate Events Report" listing each time Smith was sent to outdoor exercise while he was housed in the Polk County Jail. Between September 28, 2008, and June 7, 2011, Smith exercised outdoors 781 times. During the period material to Smith's deprivation of outdoor exercise claim, February 2010 to April 2010, Smith was sent to exercise 33 times, and never went for longer than nine days without outdoor exercise. Smith offers no evidence to the contrary, and there is no evidence suggesting that Smith ever suffered any adverse health effects in consequence of any period of abstinence from exercise.

A finder of fact could not conclude on the basis of the evidentiary record that Smith was denied the opportunity for outdoor exercise for any sufficiently prolonged period to rise to the

Page 13 - FINDINGS AND RECOMMENDATION

level of an unconstitutional deprivation. In consequence, the identified defendants' motion for summary judgment should be granted as to Smith's individual-capacity Section 1983 claim premised on Shipley's alleged deprivation of his Fourteenth Amendment rights in connection with deprivation of outdoor-exercise privileges.

### 2. Smith's Fourteenth Amendment Claim Premised on Denial of Television-Watching Privileges Alleged Against Shipley in her Individual Capacity

Smith's second Fourteenth Amendment claim against Shipley arises in connection with her alleged conduct depriving Smith of opportunities to watch television. It is worth noting in this regard that detainees have no constitutional right to watch television. *See, e.g., More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993). However, any restriction of a pretrial detainee's freedoms may constitute a due process deprivation if punitively imposed rather than reasonably related to a legitimate institutional goal. *See, e.g., Bell*, 441 U.S. at 535-539.

Shipley offers into evidence her own declaration that Smith was not deprived of the privilege of watching television except in connection with "lockdown" punishments imposed on Smith for such rule infractions as threatening other persons "physically and sexually," fighting, assaulting other inmates, and "shimming" the door to his cell. A jail may legitimately have the goal of maintaining inmate safety by preventing fights, threats, and unauthorized egress from cells, and the lockdown punishments Smith received are reasonably related to achieving that goal. For that reason, a finder of fact could not conclude on the basis of the evidentiary record that Smith was punitively deprived of his television-watching privileges. The identified defendants' motion for summary judgment should be granted as to Smith's individual-capacity Section 1983 claim premised on Shipley's alleged deprivation of his Fourteenth Amendment

rights in connection with deprivation of television-watching privileges.

### 3. Smith's Fourteenth Amendment Claim Premised on his Placement in a Medical Cell Alleged Against Shipley in her Individual Capacity

Smith's third Fourteenth Amendment claim against Shipley arises in connection with her alleged conduct in ordering him placed in a medical cell where he was subject to continuous monitoring via video camera. Pretrial detainees have no fundamental constitutional right to privacy, *see Bell*, 441 U.S. at 467, but as noted above any restriction of a pretrial detainee's freedoms may constitute a due process deprivation if punitively imposed rather than reasonably related to a legitimate institutional goal, *see id.* at 535-539.

Shipley offers into evidence her sworn declaration that Smith was never assigned any cell for the purpose of punishing him and that she made the decision to house him temporarily in a medical cell "because [Polk County Jail staff] could monitor [that] cell and it was the safest place until other arrangements could be made." Smith offers no contrary evidence.

As noted above, inmate safety is a legitimate goal, and the decision to place Smith in a medical cell on a temporary basis is rationally related to furthering that goal. In the absence of any evidence to contradict Shipley's testimony that Smith was housed temporarily in a medical cell for his own safety and not for punitive purposes, a finder of fact could not reasonably conclude that Shipley violated Smith's Fourteenth Amendment rights when she made the decision to house Smith in a medical cell. The identified defendants' motion for summary judgment should be granted as to Smith's individual-capacity Section 1983 claim premised on Shipley's alleged deprivation of his Fourteenth Amendment rights in connection with Smith's placement in a medical cell.

### B. Smith's First Amendment Retaliation Claim Alleged Against Shipley in her Individual Capacity

Smith alleges that Shipley violated his rights under the First Amendment by retaliating against him for filing grievances when she ordered Smith transferred back to B-Block in 2010. The Ninth Circuit has opined that:

> Of fundamental import to prisoners are their First Amendment rights to file prison grievances. . . and to "pursue civil rights litigation in the courts. Without those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices. And because purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield.

*Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005) (citations, internal quotation marks and modifications, and footnotes omitted). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Id.* at 567-568 (footnote omitted), *citing Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000), *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994).

Shipley offers her sworn declaration that she never ordered Smith's transfer to any cell or unit in retaliation for any of his conduct. Moreover, Shipley declares that the decision to transfer Smith back to B-Block from D-Block in February 2010 was made after Smith was involved in a fight with another inmate in D-Block, and after a hearing procedure at which Smith had an opportunity to argue and present evidence that he should not be so transferred.

Page 16 - FINDINGS AND RECOMMENDATION

In the absence of any evidence from which a finder of fact could reasonably infer that the decision to house Smith in B-Block was motivated by retaliatory animus, and in light of Shipley's declaration that the transfer decision was not so motivated, Shipley is entitled to judgment as a matter of law as to Smith's First Amendment retaliation claim. The identified defendants' motion for summary judgment should therefore be granted as to Smith's individual-capacity Section 1983 claim premised on Shipley's alleged deprivation of his First Amendment rights.

### C. Smith's Claim of Intentional Infliction of Emotional Distress Alleged Against Shipley in Both her Individual Capacity and her Official Capacity

Smith alleges that Shipley's complained-of conduct in denying him outdoor-exercise and television-watching privileges, in ordering him placed in a medical security cell, and in ordering him transferred to B-Block, discussed above, violated Oregon's common-law prohibition of intentional infliction of emotional distress. Under Oregon law, to state a claim for intentional infliction of emotional distress a plaintiff must allege that "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995), quoting *Sheets v. Knight*, 308 Or. 220, 236 (1989). A defendant acts with intention to cause emotional distress when the defendant intends an action that the defendant knows is substantially certain to cause emotional distress. *See id.*, at 551.

The Oregon courts have held that the trial court must play a "gatekeeper role in evaluating the viability of an [intentional infliction of emotional distress] claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable

Page 17 - FINDINGS AND RECOMMENDATION

behavior and creates a jury question on liability." *House v. Hicks*, 218 Or. App. 348, 358 (Or. Ct. App. 2008), *citing Tenold v. Weyerhaeuser Co.*, 127 Or. App. 511, 517 (1994); *Pakos v. Clark*, 253 Or. 113 (1969). The *House* court opined that "[w]hether conduct is an extraordinary transgression is a fact-specific inquiry, to be considered on a case-by-case basis, based on the totality of the circumstances. [The courts must] consider whether the offensiveness of the conduct exceeds any reasonable limit of social toleration, which is a judgment of social standards rather than of specific occurrences." *Id.* at 358-359 (internal quotation marks and modifications omitted), *quoting Hall v. The May Dep't. Stores*, 292 Or. 131, 137 (1981).

The most important of the contextual factors the courts must consider in evaluating whether alleged conduct may support a viable claim for intentional infliction of emotional distress is whether the parties are in a "special relationship . . . , such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen [relationship], that shapes the interpersonal dynamics of the parties. *Id.* at 360. "A defendant's relationship to the plaintiff may be one that 'imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers.'" *Id., quoting McGanty*, 321 Or. at 547-48. The courts also consider whether the complained-of conduct was illegal or criminal, whether the conduct was undertaken with an "ulterior motive," whether the conduct was intended to "take advantage of an unusually vulnerable individual," and the setting in which the conduct occurred. *Id.* at 359, 360 (citations omitted).

The complained-of conduct is discussed in detail above. None of the conduct is sufficiently beyond the reasonable limit of social tolerability to support a claim of intentional

Page 18 - FINDINGS AND RECOMMENDATION

infliction of emotional distress. In consequence, the identified defendants' motion should be granted as to Smith's intentional infliction of emotional distress claim in its entirety.

## V.  Smith's Claim Alleged Against Wolfe in his Individual Capacity

Smith alleges Wolfe's liability under Section 1983 for the violation of his rights under the Fourteenth Amendment by "knowingly and intentionally" allowing Shipley and Doe to deprive him of his outdoor-exercise and television-watching privileges. Because (for reasons discussed above) Smith's Fourteenth Amendment rights were not violated when he was deprived of those privileges, his claim against Wolfe necessarily fails. The identified defendants' motion should be granted as to Smith's Section 1983 claim alleged against Wolfe in his individual capacity.[5]

## CONCLUSION

For the reasons set forth above, Smith's Section 1983 claims alleged against defendant Doe in her individual capacity and his state-law claims alleged against defendant Doe in both her individual and her official capacity should be dismissed without prejudice, and defendants' motion (#38) for summary judgment should be denied as moot as to those claims against Doe and otherwise granted. A final judgment should be prepared.

---

[5] I note that there is no merely supervisory liability under Section 1983. *See, e.g., Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). However, a supervisor may have sufficient personal involvement in a constitutional violation to permit imposition of liability under Section 1983 where the supervisor knowingly refuses "to terminate a series of acts by others, which [the supervisory official] knew or reasonably should have known would cause others to inflict constitutional injury." *al-Kidd v. Ashcroft*, 580 F.3d 949, 965 (9th Cir. 2009). Because Smith's theory of Wolfe's liability is that he knowingly refused to prevent Shipley and Doe from depriving him of his constitutional rights, the non-availability of vicarious liability under Section 1983 does not provide a basis for granting defendants' motion.

Page 19 - FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

## NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

Dated this 10th day of December, 2012.

_/s/ Paul Papak_
Honorable Paul Papak
United States Magistrate Judge